**Seth ROSENFELD, Plaintiff–Appellee,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE; the Federal Bureau of Investigation, Defendants–Appellants.**

No. 91–16538.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 16, 1992.

Submission Vacated May 7, 1993.

Resubmitted Jan. 24, 1995.

Decided June 12, 1995.

Freddi Lipstein, U.S. Dept. of Justice, Washington, DC, for defendants-appellants.

Thomas Steel, Steel, Clarence & Buckley, San Francisco, CA, for plaintiff-appellee.

Before: SCHROEDER, NORRIS, and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

Seth Rosenfeld sued the Department of Justice and the Federal Bureau of Investigation (the government) under the Freedom of Information Act (FOIA) to obtain information about FBI investigations of several individuals and 1960s protests at the University of California, Berkeley. The government appeals from the district court's grant of summary judgment, which ordered the government to release various documents it sought to withhold under FOIA exemptions.

I. *Background and Proceedings Below*

From late 1981 through early 1984, Rosenfeld filed requests with the Federal Bureau of Investigation (FBI) under FOIA, 5 U.S.C. § 552.[1] Rosenfeld sought release of documents relating to the FBI's investigation of people and organizations involved in the Free Speech Movement (FSM). The FSM organized demonstrations at the University of California, Berkeley (UC Berkeley), which protested campus regulations restricting political activities on campus grounds. The FBI located 8,432 documents responsive to the requests. It released 1,795 pages in their entirety, released 4,985 in redacted form, and withheld 1,652 pages in their entirety.

The parties litigated over documents in nine FBI files, but the government only appeals from rulings on documents in three, the FSM, Higgins, and Kerr files. As part III describes in greater detail, the government began investigations of the FSM out of a concern that its leaders were members of communist or subversive organizations. Clark Kerr was Chancellor of the UC Berkeley campus from 1952 to 1958 and President of the UC system from 1958 to 1967. Marguerite Higgins wrote about the FSM as a journalist.

Rosenfeld filed suit in the District Court for the Northern District of California on February 22, 1985, seeking release of the withheld information. The district court referred the matter to a magistrate. The parties agreed to focus their dispute on a representative sample of documents, using the court's ruling on these documents as guidance in processing and releasing the approximately 6,600 disputed documents. The FBI filed a *Vaughn* index[2] on a representative sample of 200 disputed documents picked by both parties and an additional index for 250 additional documents chosen by Rosenfeld. Both parties also filed declarations (some *in camera*) in support of their arguments. The magistrate conducted *in camera* review of the full texts of the indexed documents and 36 additional pages requested by the FBI. On February 3, 1988, the magistrate filed her opinion and recommendations.

On March 29, 1991, the district court issued its opinion based in part on the magistrate's recommendation and its own independent review of the record. 761 F.Supp. 1440 (N.D.Cal.1991). The court made two general findings relevant to this appeal. First, the court held that no document in the FSM file generated after January 19, 1965 qualified for any exemption 7 withholding requests because none of these documents were compiled with a law enforcement purpose. *Id.* at 1448. Second, the court found that the documents in the Kerr file also were not filed for a law enforcement purpose. *Id.* at 1449. As to the remaining exemptions in these and other files, the court set out its specific findings in the appendix to its opinion. *Id.* at 1450–63. The district court ordered the FBI to reprocess and release the remaining documents in accordance with its opinion. The court also ordered that any requested documents not yet indexed by the government be indexed and submitted to the court.

The government moved for reconsideration of this judgment. Two of the government's reasons for reconsideration are relevant to this appeal. The government argued that certain documents filed in the FSM file had been cross-filed into that file from other FBI investigatory files, and were exempt for a law enforcement purpose not connected to the FSM investigation. The government also

---

1. Hereinafter, references to "section" refer to sections in title 5 of the United States Code.

2. *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973).

asked the district court to reconsider some of its findings in light of the Supreme Court's decision in *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). On September 23, 1991, the district court denied the government's motion for reconsideration.

The district court had subject matter jurisdiction of this case under 28 U.S.C. § 1331. The government filed a timely notice of appeal of the order denying reconsideration on September 27, 1991.[3] We have jurisdiction under 28 U.S.C. § 1291.

## II. *Standard of Review*

■ We review the legal conclusions in the district court's grant of summary judgment de novo. In this circuit, we apply a special standard to review factual issues arising in an appeal from a grant of summary judgment in a FOIA case. Instead of determining whether a genuine issue of material fact exists, we employ the following two-step standard. We inquire whether an adequate factual basis supports the district court's ruling. If such a basis exists, we overturn the ruling only if it is clearly erroneous. *Painting Indus. Market Recovery Fund v. Dep't of Air Force*, 26 F.3d 1479, 1482 (9th Cir.1994).

## III. *Exemption 1: Information Classified in the Interest of National Security*

■ The district court denied the government's requests to withhold material from FSM Docs. 51 and 495, Higgins Doc. 22, and Kerr Doc. 244 on exemption 1 grounds.[4] 761 F.Supp. at 1451, 1454, 1456–57, 1461. The government appeals from these denials.

■ The government bore the burden to sustain each of its exemption 1 claims. To carry this burden, the government needed to "provide the court and [Rosenfeld] with information sufficient to determine whether the source was truly a confidential one and why disclosure of the withheld information would lead to exposure of the source." *Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991). The government needed to "describe [the] particular withheld document, identify the kind of information found in that document that would expose the confidential sources, or describe the injury to national security that would follow from the disclosure of the confidential source of the particular document." *Id.* at 981. It would not have been enough to rely "on general assertions that disclosure of certain categories of facts may result in disclosure of the source and disclosure of the source may lead to a variety of consequences detrimental to national security." *Id.*

■ Neither the government's appeal briefs nor its withholding requests demonstrate with any particularity why portions of FSM Doc. 51, Higgins Doc. 22, or Kerr Doc. 244 should be exempted from the disclosure order. The district court correctly concluded that the government did not carry its burden as to these withholding requests. The government asks us to reverse the district court for not having afforded the government's classification decisions substantial weight. *See id.* at 980. This contention does not persuade us because the government failed to make an initial showing which would justify deference by the district court. *See id.*

Having reviewed the government's request to withhold information from FSM Doc. 495, we are satisfied that the government carried its burden. The government showed with particularity how disclosure might reveal the identity of an intelligence source. The district court sustained the government's request in part by allowing the government to delete information identifying the informant, but ruled that the document, edited accordingly, would not reveal the informant's identity. 761 F.Supp. at 1454. We are satisfied that the district court gave the government's

---

**3.** The version of Federal Rule of Appellate Procedure 4 in effect in 1991 only allowed a party to file a notice of appeal after the district court had disposed of all pending post-judgment motions.

**4.** Exemption 1 allows the government to withhold "matters that are ... specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and ... are in fact properly classified pursuant to such an Executive order." 5 U.S.C. § 552(b)(1).

Hereinafter, all "exemption" references refer to FOIA exemptions under section 552(b).

request substantial weight, and find that the district court did not clearly err in finding that FSM Doc. 495 could be disclosed in part while still accommodating the government's classification interest.

### IV. Exemption 7: Documents Ordered Disclosed As Having No Law Enforcement Purpose

#### A. The Rational Nexus Test

■ The remaining document disclosures all raise issues about 5 U.S.C. § 552(b)(7). This section includes six different exemptions, all of which share the threshold requirement that the withheld record be "compiled for law enforcement purposes." The district court denied some withholding requests because the documents were not compiled for any law enforcement purpose, and others because, although the documents met this threshold requirement, they did not satisfy the requirements of any of the particular exemptions. This part addresses rulings that documents had no law enforcement purpose. Parts IV, V, and VI consider exemption 7(C), 7(D), and 7(E) issues, respectively.

The government always bears the burden to show that a given document is covered by an exemption and should be withheld. 5 U.S.C. § 552(a)(4)(B). However, in this case, the government's burden for satisfying the threshold requirement of exemption 7 is easier to satisfy than the burden for other requirements. The releasing agency in this case, the Federal Bureau of Investigation, has a clear law enforcement mandate. *Binion v. Department of Justice,* 695 F.2d 1189, 1194 (9th Cir.1983). Because of this mandate, the government "need only establish a 'rational nexus' between enforcement of a federal law and the document for which [a law enforcement] exemption is claimed." *Church of Scientology v. Department of the Army,* 611 F.2d 738, 748 (9th Cir.1979).

The rational nexus test requires courts to accord a degree of deference to a law enforcement agency's decisions to investigate. The court need not accept the government's claim that a previous investigation had a law enforcement purpose if the asserted purpose is "pretextual or wholly unbelievable." *Pratt v. Webster,* 673 F.2d 408, 421 (D.C.Cir.1982).[5] However, in other circumstances, the court should not "second-guess a law enforcement agency's decision to investigate if there is a plausible basis for the decision." *Id., cited in Wilkinson v. FBI,* 633 F.Supp. 336, 343 (C.D.Cal.1986).

#### B. Marguerite Higgins

■ The government appeals from the district court's ruling that "[t]here is nothing in the [Marguerite] Higgins documents that indicates any legitimate law enforcement purpose within the purview of the statutes and the case law." 761 F.Supp. at 1449. The government presented declarations below that the FBI investigated Higgins as a security precaution before she married a chief of intelligence for a major theater of military command. While this evidence would demonstrate a plausible law enforcement purpose, there was also evidence that the FBI did not investigate her until four years after her marriage, contemporaneously with a tour of Russia by her. This evidence suggested that the government's purpose was a pretext to investigate her for her activities in the Soviet Union, and the district court did not clearly err in finding that the asserted purpose was in fact pretextual.

#### C. Clark Kerr

■ The government also appeals from the district court's conclusion that "[t]he Clark Kerr documents as a whole are not entitled to a (b)(7) exemption since it is clear that they do not relate to any investigation performed in connection with a legitimate law enforcement purpose." 761 F.Supp. at 1449. We agree with the district court's

---

5. The District of Columbia Circuit's test for a law enforcement agency's showing of law enforcement purpose resembles ours closely. If the agency's investigatory activities that give rise to the documents at issue relate to federal law enforcement or national security, "the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Pratt,* 673 F.2d at 420–21.

conclusion except as to two documents in the Kerr file.

The government argued for withholding Kerr files because they were compiled to complete four personnel investigations. The FBI undertook a 1947 investigation on behalf of the Atomic Energy Commission (AEC), which was considering Kerr for an appointment as a labor advisor. It performed a 1953 investigation on behalf of the AEC again, because Kerr, as Chancellor of the University of California, had access to classified matters from UC nuclear energy laboratories. (Rosenfeld sought access to the report of this investigation, labelled Kerr Doc. 1 in the district court's index.) The FBI completed a 1958 investigation on behalf of the White House, which was considering Kerr for an appointment to the International Development Advisory Board. Last, it performed a 1964 investigation on behalf of the White House, which was considering him for an appointment to the Board of the Communications Satellite Corporation. (Rosenfeld also sought access to this document, labelled Kerr Doc. 21 in the district court's index.)

█ We have held that FBI pardon applicant investigations satisfy the rational nexus test. *Binion*, 695 F.2d at 1194. We think that FBI government appointment investigations also satisfy the rational nexus test. As a result, the government has satisfied its burden of showing that these four records were compiled with a rational nexus to a law enforcement purpose. However, the government's evidence does not preclude the possibility that the asserted purpose for which these documents were compiled was pretextual. Nor did it compel the district court or compel us now to find that the rest of the documents in the Kerr file were compiled with the same purpose.

Rosenfeld introduced evidence showing that the FBI waged a concerted effort in the late 1950s and 1960s to have Kerr fired from the presidency of UC Berkeley. The earliest evidence of this effort is Doc. 2, a memorandum dated two months before the 1958 investigation. The memo notes that Kerr was formally inaugurated as President of UC Berkeley, and offers investigative information about Kerr "merely for [the FBI's] information and in the event that the Bureau may receive some inquiry concerning Dr. Kerr, who at best is a highly controversial figure in California education." We will not recite all of the documentation for this campaign to fire Kerr, but we will describe some of the highlights. FBI agents counted the number of Regents on Berkeley's Board of Regents who would support or oppose an attempt to have Kerr removed as President. One agent made a recommendation to the file in 1965 that Kerr be fired for his "lack of administration" during student protests. Last, then FBI–Director J. Edgar Hoover made a notation on the margin of one report that he knew "Kerr is no good."

These documents all support a conclusion that these reports were compiled with no rational nexus to a plausible law enforcement purpose—that any asserted purpose for compiling these documents was pretextual. Doc. 2 suggests that the FBI knew no investigation was pending and that the FBI had no reason to investigate him. The later documents all strongly support the suspicion that the FBI was investigating Kerr to have him removed from the UC administration, because FBI officials disagreed with his politics or his handling of administrative matters. Conspicuously absent from these documents is any connection to any possible criminal liability by Kerr. While the statements of dislike for Kerr in the record are egregious, the other documents constitute "precisely the sort of generalized monitoring and information-gathering that are not related to the Bureau's law enforcement duties." *Lamont v. Department of Justice*, 475 F.Supp. 761, 775 (S.D.N.Y.1979). We also agree with the district court that these documents support a presumption that any other documents compiled after the campaign against Kerr began were compiled with no rational nexus to an asserted law enforcement purpose.

The only documents in the Kerr file for which such a presumption might be rebutted are the reports of the personnel investigations. Rosenfeld seeks disclosure of two of the four personnel investigations, the 1953 report (Doc. 1) and the 1964 report (Doc. 21). Since the earliest evidence of the campaign to have Kerr fired is in 1958, there is no

factual basis to conclude that the campaign extended back to 1953. Thus, no evidence in the record rebuts the government's asserted law enforcement purpose, to conduct a background check requested by another agency. We therefore reverse and remand for a determination whether any of the specific exemption 7 exemptions apply to Kerr Doc. 1.

The 1964 report, Doc. 21, was compiled after the campaign against Kerr started. The district court's opinion gives no indication whether the court considered that the document might have been compiled for a legitimate purpose, a personnel report, even if contemporaneous documents were compiled for a different purpose. *See id.* at 1449, 1457. We remand for a determination whether other evidence renders unbelievable the government's assertion that Doc. 21 was compiled to complete a personnel background check.

The government has presented no other evidence rebutting the evidence that documents in the Kerr file compiled after 1958 were compiled with an illegitimate law enforcement purpose, to have Kerr fired from his position in the UC system. We affirm the district court's rulings as to the rest of the Kerr file.

### D. *The Free Speech Movement*

█ The government sought to withhold many documents in the FSM file under the various exemption 7 exemptions. The district court ruled that the government showed a law enforcement purpose covering FSM documents dated before January 19, 1965. 761 F.Supp. at 1444–45. However, it concluded that the investigation's rational nexus to a law enforcement purpose expired as of that date, and thus declined to allow withholding of documents after that date on exemption 7 grounds. *Id.* at 1448. The government appeals from the portion of the district court's opinion ordering it to disclose all post-cutoff FSM documents not ordered withheld under an exemption other than exemption 7.

The government asserted two purposes that could have supported the conclusion that all the records in the FSM file, pre- and post-cutoff, were compiled with a law enforcement purpose. The district court found that the FBI investigated whether and to what extent the FSM was influenced by subversive organizations or would be likely to lead to civil disorder. *Id.* at 1445. The FBI corroborated these two purposes by identifying two individuals in the FSM leadership with communist leanings and indicating the potential for disorder in the demonstrations and civil disobedience occurring at UC Berkeley in 1964. *Id.*

The district court concluded that the records put in the FSM file from October 1964 to January 1965 were compiled with a law enforcement purpose. However, the court also concluded that this purpose "disintegrated," that the FBI invoked it merely as a pretext to pursue routine monitoring, with respect to documents put in the file after January 19, 1965. *See id.* at 1445, 1448. Neither party contests the court's finding of a valid law enforcement purpose from October 1964 to January 1965.

We affirm the district court's ruling because the court did not clearly err in determining that any post-cutoff law enforcement purpose was invoked only as a pretext to monitor the subjects of the FSM investigation. The record contains a January 28, 1965, memorandum showing that the FBI gave information about some of the investigation subjects to a member of the UC Board of Regents at the request of then-CIA Director John McCone. A later memo indicated that the Regent would use the information to "curtail, harass and at times eliminate Communists and ultra liberal members on the faculty." These documents strongly suggest that the January 28 memo was compiled to harass political opponents of the FBI's allies among the Regents, not to investigate subversion and civil disorder. They also suggest that by that date the FBI may no longer have had a legitimate purpose to continue its investigation of the FSM subjects. The FSM file also contains many reports compiled after the cutoff date about the activities of Mario Savio, an FSM leader. Read together, the documents admit that the FBI found he had negligible contacts with communists, and suggest the FBI was interested in investigating him for his "contemptuous

attitude" instead of his possible subversiveness.

The district court found that a January 19, 1965, memorandum, which reported that the FSM and the UC demonstrations were not controlled by communists, was the last document in the FSM file to be compiled with a law enforcement purpose. Based on our review of the documents that followed this memorandum, we cannot say that the district court clearly erred in determining that this was the last document compiled with a rational nexus to a legitimate law enforcement purpose. We affirm the district court's exemption 7 ruling as to documents compiled directly into the FSM file.

### E. *Channelized Documents*

The last set of documents subject to an exemption 7 challenge are documents cross-filed (channelized) into the FSM file from other FBI investigation files. The government argues, citing *FBI v. Abramson*, 456 U.S. 615, 626, 102 S.Ct. 2054, 2061–62, 72 L.Ed.2d 376 (1982), that because these documents were exempt in the files in which they were originally compiled, the district court should not have ordered their disclosure even if the court ordered the disclosure of the file in which they were channelized.

■ The government did not raise this argument to the district court in its summary judgment motion; it first raised the argument in support of reconsideration of the summary judgment ruling. The district court refused to reconsider because the government failed to show why it could not have presented the argument to the court before summary judgment. The district court did not abuse its discretion in declining to consider an argument raised for the first time on reconsideration without a good excuse. *Schanen v. Department of Justice*, 762 F.2d 805, 807, 808 (9th Cir.1985), *modified on other grounds*, 798 F.2d 348 (9th Cir.1985). We thus affirm the district court's rulings on the channelized documents.

### V. *Exemption 7(C): Information Invading Privacy*

The district court ordered the disclosure of some pre-cutoff FSM documents notwithstanding government requests to exempt them under exemption 7(C).[6] *See* 761 F.Supp. at 1450–54. After the district court issued its opinion, the government moved for the court to reconsider its 7(C) rulings in light of *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), which was decided after the parties submitted their papers on the cross-motions for summary judgment.

The government appeals from the district court's denial of the reconsideration motion. It also asks us to reverse portions of the district court's ruling in light of *Department of State v. Ray*, 502 U.S. 164, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991), which was decided on or after the district court's order denying reconsideration. Instead of appealing from orders to disclose individual documents, the government argues that the district court applied the law erroneously in three respects, and that these errors require us to reverse the disclosure orders for many documents. Before we consider these alleged errors, which all go to the privacy interests at stake for individual documents, we review the public interest at stake for all the documents.

■ Exemption 7(C) requires us to balance the privacy interests of the individuals protected by the nondisclosure against the public interest at stake. *Reporters Comm.*, 489 U.S. at 762, 109 S.Ct. at 1476. The sole cognizable public interest for FOIA is the interest "to open agency action to the light of public scrutiny," to inform the citizenry "about what their government is up to." *Id.* at 772, 773, 109 S.Ct. at 1481, 1481–82 (internal quotations omitted).

■ We agree with the district court that this interest exists here. It certainly serves FOIA's purpose to disclose publicly records that document whether the FBI abused its law enforcement mandate by overzealously investigating a political protest

---

**6.** Section 552(b)(7)(C) allows the government to withhold documents which are compiled for a law enforcement purpose and which "constitute an unwarranted invasion of privacy."

movement to which some members of the government then may have objected.

The government argues that the issue here is the extent of the public interest in knowing the identities of the subjects of these documents, not the interest in the other contents of the documents. The government's point comports with Supreme Court precedent. In *Ray*,[7] the Court analyzed the interest in public access to interviews the Department of State conducted with repatriated Haitian refugees. The Department of State conducted these interviews to determine whether Haiti's government was retaliating against the returnees for having attempted to leave the country. *Ray*, 502 U.S. at 167–69, 112 S.Ct. at 544. The Court recognized that the public interest was "whether the State Department ha[d] adequately monitored Haiti's compliance with its promise not to prosecute returnees." *Id.* at 177–79, 112 S.Ct. at 549. The Court was convinced, however, that this interest could be served without releasing the names of the interviewees. *Id.; see also Reporters Comm.*, 489 U.S. at 773–74, 109 S.Ct. at 1481–82; *Department of Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976).

We conclude that this precedent is distinguishable because the public interest in this case may not be served without disclosing the names of the investigation subjects. The public interest in this case is knowing whether and to what extent the FBI investigated individuals for participating in political protests, not federal criminal activity. Disclosing the names of the investigation subjects would make it possible to compare the FBI's investigations to a roster of the FSM's leadership. Therefore, disclosing the names of investigation subjects promotes the public interest of this FOIA request.

In light of this strong public interest, we consider the government's arguments about the district court's weighing of privacy interests. The government first asserts that the district court erred in giving minimal weight to the privacy interests of the subjects of its investigations, contrary to *Reporters Committee* and *Ray*. We find nothing in the record to suggest that the district court made such an error. None of the court's findings as to the FSM documents denied a 7(C) exemption because the only privacy interest was the interest of an investigated third party in keeping the investigative report confidential. *See* 761 F.Supp. at 1450–54.[8] We see no basis here to disturb the district court's rulings.

The government also argues that the district court erred by concluding that "the passage of time" diminished investigation subjects' interest in keeping secret the events reported in the investigation. However, having reviewed the specific rulings that the government would have us reverse on this basis, FSM Docs. 42 and 402, we note that this argument incorrectly characterizes the district court's use of the passage of time. In Doc. 42, the court ordered a police officer's name disclosed, but not the police unit where he was stationed. *Id.* at 1450. The court reasoned that "[d]ue to the . . . passage

---

7. The Court applied exemption 6, not exemption 7(C), in *Ray*. Section 552(b)(6) allows the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Exemptions 6 and 7(C) both involve balancing public interests against privacy interests, but exemption 6 withholding requests require a showing of a more intrusive invasion of privacy. While exemption 6 cases have limited relevance to exemption 7(C) cases with respect to balancing, they are certainly relevant in describing how to define the interests at stake.

8. The government offers only one piece of evidence of the district court's alleged error. The government asserts that at the hearing on the motion for reconsideration, the court stated, with reference to *Reporters Committee*, "I don't very honestly see how that changes things." However, this assertion takes the court's statement out of context. The court was speaking to a request by the government for the court to hear the merits of the motion, notwithstanding a serious factual question about whether the government failed to file and serve the motion in a timely manner. The court's comment about the new Supreme Court decision not "chang[ing] things" speaks to the court's refusal to hear oral argument on the merits of the motion. The court decided on the bench that the new Supreme Court case was not enough reason to grant oral argument when the court normally did not hear argument on reconsideration motions and when there was a possibility that the district court had no jurisdiction to consider the merits.

of time, it is unlikely that disclosure of the unit would lead to the identity of the officer." *Id.* In FSM Doc. 402, the court ordered the disclosure of a party's name because the name "is only a first name, and a common one at that," and because "[r]elease would not identify the person, especially given the passage of time." *Id.* at 1453.

The district court in each of these cases *respected* the document subject's privacy by refusing to order the disclosure of the subject's name. The court ordered the disclosure of information that might in some circumstances lead to the identity of the person. However, the court found in each case as a matter of fact that the information was not likely to identify the party, in part because it would be impracticable to conduct an identity search more than twenty-five years later. The district court accommodated, not disregarded, the subjects' privacy.

Last, the government argues that the district court erred by affording less weight to the privacy interests of the subjects of some documents, because those subjects were well-known to have been active in the FSM. The government did not specifically identify for us the documents affected by this alleged error. We presume from our review of the district court's opinion that the government is appealing from the orders to disclose names in FSM Docs. 42, 342, 352, and 371 on this basis. *See* 761 F.Supp. at 1450-53. The court overruled the requests to withhold names in these documents because "the individuals in question engaged in activities which made it very likely that the FBI would take an investigative interest in them. Confirmation that the FBI did take such an interest adds little or nothing to whatever consequences the already-public knowledge of their activities may have." *Id.* at 1450.

■ On this issue, we share the government's concern that the district court's characterization of the subjects' privacy interests may be "cramped." *Reporters Comm.*, 489 U.S. at 763, 109 S.Ct. at 1476-77. Disclosing the names of an investigation subject would not merely confirm that the FBI took an investigative interest in that person. The contents of the investigation file might exceed the scope of the FSM investigation.

For instance, the file could contain highly personal information, the disclosure of which could prove embarrassing. *See Ray,* 502 U.S. at 175-77, 112 S.Ct. at 548. Furthermore, the investigative reports could contain information indicating that the subject was involved in criminal activity unrelated to the FSM. The subjects' high profiles in the FSM would not lessen their interest in keeping secret this separate information. We have held that it is better to err on the side of subjects' privacy interests even in cases where they may have held themselves out. *Cf. Church of Scientology Int'l v. IRS,* 995 F.2d 916, 920-21 (9th Cir.1993) (declining to construe subjects' oral waiver to objection to disclosure of the information at issue as an actual waiver).

We remand the district court's judgment as to FSM Docs. 42, 342, 352, and 371. The district court should determine whether these documents contain information, relating to individuals whose names have been withheld, that exceeds the scope of FSM criminal investigations. We cannot make this determination because it is factual in nature. If the documents have no such information, the district court's rulings on them may stand. If the documents do contain information unrelated to the FSM, the district court should determine how much release of this information would invade the privacy of individuals whose names have been withheld, and balance this interest against the strong public interest in access to the individuals' identities. We affirm the district court's rulings on exemption 7(C) requests in all other respects.

### VI. *Exemption 7(D): Information Disclosing Confidential Informants*

■ The Government argues that the court applied incorrect legal standards in evaluating the FBI's claims of exemption from release of information under 5 U.S.C. § 552(b)(7)(D). That provision permits the government to withhold

> records or information compiled for law enforcement purposes, [to the extent those records] could reasonably be expected to disclose the identity of a confidential

814

source ... and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation ... information furnished by a confidential source.

The government bears the burden of establishing the applicability of the exemption. *Department of Justice v. Landano,* — U.S. —, —, 113 S.Ct. 2014, 2019, 124 L.Ed.2d 84 (1993). Under this exemption, a source is "confidential" if it "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Id.* at —, —, 113 S.Ct. at 2019–2020 (quoting S.Rep. No. 93–1200, at 13 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6291). The focus, therefore, is not whether "the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *Id.* at —, 113 S.Ct. at 2019 (emphasis in original).

▮▮▮ The Government argued in its original briefs to this court that the district court should have applied a presumption of confidentiality to sources that provided information in the course of the FBI investigations. The Supreme Court has since foreclosed this argument. In *Landano,* the Court rejected the view held by the D.C., Second, Seventh, Eighth, and Tenth Circuits that a presumption of confidentiality attaches from the mere fact of an FBI investigation. *See Dow Jones & Co. v. Dep't of Justice,* 917 F.2d 571, 576 (D.C.Cir.1990); *Donovan v. FBI,* 806 F.2d 55, 61 (2d Cir.1986); *Kimberlin v. Dep't of Treasury,* 774 F.2d 204, 208 (7th Cir.1985); *Parton v. Dep't of Justice,* 727 F.2d 774, 776 (8th Cir.1984); *KTVY–TV v. United States,* 919 F.2d 1465, 1470 (10th Cir.1990). Instead, the Court set forth a framework under which the confidentiality determination turns on the circumstances under which the subject provided the requested information. *Landano,* — U.S. at —, 113 S.Ct. at 2023.

*Landano* did not affect the application of exemption 7(D) to sources and information covered by an express assurance of confidentiality. We have observed that such an express promise of confidentiality is "virtually

unassailable." *Wiener v. FBI,* 943 F.2d 972, 986 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992). It is also easy to prove: "The FBI need only establish the informant was told his name would be held in confidence." *Id.*

The government asserts the district court erred in denying protection to several records over claims of express grants of confidence. It specifically objects to the court's refusal to treat all symbol numbered sources as protected by express grants of confidentiality. The government argued below, and again on appeal, that symbol numbered sources receive assurances from the FBI that their relationship with the FBI will not be revealed to the public, and therefore qualify as a class for exemption 7(D) protection. The district court apparently concluded otherwise. Although the government reargues the point that in fact these sources were granted express assurances of confidence, it has not pointed to anything in the record that indicates persuasively that all of these sources were "told [their] name[s] would be held in confidence." *Id.* We have no basis upon which to disturb the district court's conclusions. Further, our own review of the individual document rulings indicates that the court observed scrupulously the sanctity of the legitimate claims of express grants of confidence. We discern no error in the court's treatment of the express confidence claims.

▮▮▮ We now turn to the district court's denial of requests to withhold documents allegedly acquired through implied assurances of confidentiality. The district court rejected the government's argument that FBI sources inherently qualify for the "implied assurance" protection, and conducted a document-specific and source-specific inquiry. The court's inquiry comported with *Landano*'s command to analyze documents individually. *Landano,* — U.S. at —, 113 S.Ct. at 2019. The inquiry also anticipated *Landano*'s command to infer that the informant received an implied assurance of confidentiality only if factors like the nature of the crime being investigated and the source's relationship with the FBI made it reasonable to infer that the informant expected such an assurance.

*Id.* at ——, 113 S.Ct. at 2023. We affirm the district court's rulings denying certain documents exempt status under Exemption 7(D).

### VII. *Exemption 7(E): Information Likely to Disclose a Law Enforcement Technique*

 The government appeals from the denial of its sole request under Exemption 7(E), to withhold a portion of FSM Doc. 42.[9] The district court denied the request because the law enforcement technique at issue, a pretext phone call, "would leap to the mind of the most simpleminded investigator." 761 F.Supp. at 1450. The district court's decision is supported by holdings from district courts of the District of Columbia Circuit, that Exemption 7(E) only exempts investigative techniques not generally known to the public. *National Sec. Archive v. FBI,* 759 F.Supp. 872, 885 (D.D.C.1991); *Albuquerque Publishing Co. v. Department of Justice,* 726 F.Supp. 851, 857 (D.D.C.1989).

We agree with these courts' reasoning, and adopt it as the law of this Circuit. It would not serve the purposes of FOIA to allow the government to withhold information to keep secret an investigative technique that is routine and generally known. Accordingly, the district court did not err in applying a routine-technique exception to Exemption 7(E). We find no error in the court's finding that a pretext phone call constitutes an investigative technique generally known to the public.

We are not persuaded by the government's argument that the technique at issue is more precise, namely, the use of the identity of a particular individual, Mario Savio, as the pretext. This argument proves too much. If we were to follow such reasoning, the government could withhold information under Exemption 7(E) under any circumstances, no matter how obvious the investigative practice at issue, simply by saying that the "investigative technique" at issue is not the practice but the application of the practice to the particular facts underlying that FOIA request.

9. Section 552(b)(7)(E) exempts a record from disclosure if it was compiled for law enforcement

### VIII. *Conclusion*

We affirm the district court's judgment in all respects except the following. We reverse the ruling on Doc. 1 in the Kerr file, and remand the ruling on Doc. 21 in this file for further consideration in light of section III.C of this opinion. We remand the rulings on FSM Docs. 42, 342, 352, and 371 for proceedings consistent with part IV of this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

purposes and would "disclose investigative techniques and procedures."